UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: CASE NO. 25-15276-MAM

IVAN NILES LATIMORE,

Debtor.
_________________________________/

341 MEETING OF CREDITORS

June 12, 2025

The above-entitled cause came on for a Section 341 Meeting of Creditors before NICOLE TESTA-MEHDIPOUR, one of the trustees in the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, via Zoom, on June 12, 2025, and the following proceedings were had.

Transcribed from a digital recording by:
Cheryl L. Jenkins, RPR, RMR

APPEARANCES VIA ZOOM:

NICOLE TESTA-MEHDIPOUR, Trustee

SAUL EWING, by
TURNER FALK, Esquire
On behalf of Ferrari Financial Services

- - - - - - -


WITNESS

| Ivan Niles Latimore | Page |
| --- | --- |
| Examination by Ms. Testa-Mehdipour | 4,21 |
| Examination by Mr. Falk | 15 |

MS. TESTA-MEHDIPOUR: The next case on the docket is Ivan Niles Latimore, 25-15276.

MR. LATIMORE: Good morning, ma'am.

MS. TESTA-MEHDIPOUR: Okay, good morning, sir. This is Mr. Latimore?

MR. LATIMORE: Yes, ma'am.

MS. TESTA-MEHDIPOUR: May I have you start your video, please?

MR. LATIMORE: There you go.

MS. TESTA-MEHDIPOUR: Okay. How are you today, sir?

MR. LATIMORE: I'm good. Thank you.

MS. TESTA-MEHDIPOUR: Okay, and you're not represented by a lawyer, is that right?

MR. LATIMORE: No, ma'am.

MS. TESTA-MEHDIPOUR: Okay, that's correct, yes?

MR. LATIMORE: Ah, yes, ma'am.

MS. TESTA-MEHDIPOUR: Very good.

Let me swear you in first, please, sir. If you would raise your right hand.

Do you affirm to tell the truth, the whole truth, and nothing but the truth under penalty of perjury?

MR. LATIMORE: Yes, ma'am.

Thereupon,

IVAN NILES LATIMORE,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. TESTA-MEHDIPOUR:

Q. Please state your full name for the record.
A. Ivan Niles Latimore.
Q. Thank you.

MS. TESTA-MEHDIPOUR: Are there any creditors here for Mr. Latimore?

MR. FALK: Yes, Ms. Mehdipour, this is Turner Falk, counsel for Ferrari Financial Services.

MS. TESTA-MEHDIPOUR: Okay. Yes, good morning, Counsel.

Let's see here. All right, and will you be asking any questions today?

MR. FALK: I guess it depends on what comes before me, but likely, yes.

MS. TESTA-MEHDIPOUR: Sure. Okay, and I'll give you that opportunity.

All right, and anyone else here? I was checking the waiting room to see if anybody joined late, but I don't seem to see anyone.

(No verbal response.)

MS. TESTA-MEHDIPOUR: Okay. All right.

I've reviewed the proof of Social Security and photo ID, and it matches those as indicated on the 341 notice.

All right. Just one moment, please.

BY MS. TESTA-MEHDIPOUR:

Q. Okay. Mr. Latimore, did you use a bankruptcy petition preparer, or any other person to assist you with the preparation or the filing of your bankruptcy?

A. No, ma'am.

Q. Okay. Thank you, sir.

And I don't see any real estate listed. Are you -- let me rephrase that.

You did list a property in West Palm Beach, and you wrote in quotes, I was the owner. Are you still on the deed? Is that still in your name, the -- I don't want to read --

A. The mortgage --

Q. -- the address into the record.

A. The mortgage is still active.

Q. Okay, and it looks like they're trying to get stay relief from -- to pursue the foreclosure judgment.

Are you going to dispute that in any way?

A. I mean, I don't know what that means, actually.

Q. Okay. There's a hearing set for June 17th at 10 a.m. on the lender's motion for stay relief, and I can't give you legal advice, but if you believe you have a position on that property, then you would need to attend that hearing in front of the judge.

A. Okay.

Q. Okay.

A. I mean, there's still the mortgage that was in my name that I needed to get discharged, so I don't know --

Q. Okay.

A. -- if that's on there.

Q. Are you living there, at that property?

A. No, that -- no.

Q. Okay.

A. There's no home on the property.

Q. There's what?

A. There's no home on the property.

Q. There's no home on the property? Was it demolished?

A. Yeah.

Q. I see. Okay, so it's just land now?

A. Correct.

Q. I see.

A. All right, but there's still two mortgages

on the property.

Q. I understand. Okay. I understand now.

All right, and then you list the 2022 Telluride, and it says I sold car. So that is no longer in your possession, and you're not --

A. Correct.

Q. -- on the title to that?

A. The vehicle was sold as far as -- to another person, so they have the notarized documents that it sold, and they're working to get it out of the creditors -- out of my name, into their name.

Q. How much did you receive for the sale of that car?

A. They're taking over the payments. I didn't receive any money.

Q. Thank you.

Okay. Do you currently have a car that you're driving?

A. No.

Q. Okay. No car in your name?

A. No.

Q. No car registered in your name?

A. Just the Telluride.

Q. Okay.

A. They're working --

Q. Just that.
A. -- to get it out of my name.
Q. Thank you.
A. Yes.
Q. All right. Did you sign your bankruptcy petition, statements, schedules, and related papers, and is the signature yours?
A. Yes, ma'am.
Q. Did you read those papers before signing them?
A. Yes, ma'am.
Q. Are you personally familiar with all of the information contained in those papers?
A. Yes, ma'am.
Q. Does the address on your bankruptcy petition match your current address?
A. Yes, ma'am.
Q. Okay. Have you listed all of your assets and all of your creditors?
A. Yes, ma'am.
Q. Is this your first bankruptcy?
A. Yes, ma'am.
Q. And please tell me why you filed, sir.
A. Financial hardship, multiple deaths in my family that I had to be taken away from my job, and then I

got a DUI, which now I can't drive to the jobs that I had had. So that's why I'm unemployed, and I'm unable to work --

Q. Okay.

A. -- and the financial hardship took me under.

Q. Okay. So at this point right now, as you sit here, you're unemployed, is that right?

A. Yes, ma'am.

Q. Okay, and does anyone owe you money?

A. No, ma'am.

Q. Do you have any domestic support obligations like child support or alimony?

A. No, ma'am.

Q. I have your tax returns for '23 and '24. Are those true and correct copies of what you filed with the IRS?

A. Yes, ma'am.

Q. Were you married in '23 or '24?

A. No, ma'am.

Q. Is anyone holding, other than the Telluride that you just testified regarding, is anyone holding any of your assets or property?

A. No, ma'am.

Q. Are you entitled to life insurance proceeds or an inheritance as a result of someone's death?

A. No, ma'am.
Q. If that were to happen within 180 days from the day you filed this bankruptcy, do you understand that that money, or those assets would be property of this bankruptcy estate, to pay your creditors, and you'd have to tell me about it?
A. Yes, ma'am.
Q. Okay. All right. You list in your papers Ferrari, quote, stolen car, 360-K, close quote. Can you please explain what happened there to me?
A. Yeah, I purchased the car in 2021 from Florida, Central Florida Ferrari. The vehicle was stolen from me. State Farm, I filed a claim, and then they tried to deny the claim based off of me not filing the police report on time, and then Ferrari put a judgment on me.
So Ferrari's here, because they want to take the money, and they were in cahoots with State Farm. State Farm didn't want to pay it, so now Ferrari's coming after me. So that's an unfair assessment of what they're trying to do.
Q. When you purchased the Ferrari, what year did you say that was?
A. It was December 2021.
Q. Okay. At that time, were you working?
A. I was.

Q. What was your annual salary at that time?
A. I believe it was, what, 280, or 425 --
Q. Okay.
A. -- 425,000.
Q. What kind of Ferrari did you purchase and what year?
A. It was a 2019 Portofino.
Q. Okay. How much was the purchase price?
A. 224, maybe, something like that.
Q. Okay, and you said -- did you purchase it --
A. I traded a 488 GTB in, and there was still money owed on that car. So through that, they rolled the money over, which was owed, and I still put money down --
Q. Okay.
A. -- to be able to get that vehicle.
Q. So let's break that apart.
When you -- what did you get on the trade-in toward the purchase, approximately?
A. About 200,000, I believe. I mean, it's hard to say how they do these things. You know, the GTB was 250,000, then there's money owed, however they do it, you've got to pay the dealer fees. There's always some gimmick.
Q. What was your down --
A. So you never get ahead on the dealer.

Q. What was your down payment on the Portofino?
A. I believe it was 10,000.
Q. Okay, and did you finance it through Ferrari?
A. Ferrari Financial.
Q. Who?
A. Yes, they have their own bank.
Q. Okay. So you did it through Ferrari.
So did anyone co-sign on that loan?
A. I've never had a co-sign on anything.
Q. Okay.
A. Everything's been in my name.
Q. Okay. You had the -- you said it was a GTB?
A. Yeah, the 288 -- 488 GTB.
Q. Is that also a Ferrari?
A. Yes.
Q. How did you afford that vehicle at that point?
A. I mean, I was working. I was making -- I was building gyms. I was traveling. I was training. I mean, I had substantial income.
Q. Okay, and where you list in your papers, GM Financial, stolen car. That's a totally separate thing from this?
A. I mean, I had four cars that were stolen

from me because I was out of the country, and somebody obviously knew that I was into exotic cars.

Q. Okay, and where -- let's go back to the Ferrari. Where was that housed?

A. That was in California, actually. It was in Florida, but I did a car show, and it was transferred to Blue Star, to my property in Beverly Hills, and it was stolen --

Q. Okay.

A. -- while I was out of the country.

Q. So the Ferrari was in Beverly Hills. Was that a property -- was that real -- did you own real property in Beverly Hills or were you renting?

A. That was a rental property.

Q. Okay.

A. And there's a police report on that as well.

Q. Okay.

A. So there was a police report given on that vehicle from the Los Angeles Police Department, and State Farm didn't want to honor that.

Q. Okay. So did you present that California police report to State Farm as part of your claim?

A. Yes, I did.

Q. Okay. So were the other vehicles stolen at the same time as the Ferrari?

A. Yes, they were.
Q. So there were --
A. They paid for the other ones.
Q. Okay. So a total of how many cars were stolen at that point?
A. Four vehicles.
Q. Four vehicles.
Okay, and did you own any of the other vehicles that had been stolen, other than the --
A. They were all financed --
Q. -- Portofino?
A. They were just -- I mean, obviously when you finance a car, they say you own it, but obviously you're financing it.
Q. Okay.
A. So they were all financed through other banks.
Q. Right, but they were financed in your name, and you were paying --
A. Yes.
Q. -- for them, right?
A. Yes.
Q. Okay. Thank you.
MS. TESTA-MEHDIPOUR: While we're on this area, Counsel, do you want to ask any questions?

MR. FALK: Yes, I would like to.

MS. TESTA-MEHDIPOUR: Go ahead.

EXAMINATION

BY MR. FALK:

Q. Mr. Latimore --

A. Yes, sir.

Q. -- the trustee had mentioned the listing in your schedules for $25,000 to GM Financial for a stolen car. Which car does that relate to?

A. That's a Corvette that was stolen that was recovered, and they auctioned the car for $90,000. There was still $25,000 owed on the loan.

Q. And when you said that insurance paid for three of the four stolen cars, did you mean that it also paid for this GM car?

A. No, the GM -- so State Farm agreed to fix the car. I didn't want the car to be fixed because it was -- if you would have saw what these people did to the car that stole it, no one would want to be in a car that was cigarette holes in a brand new car. So they were supposed to get everything done, they never did, so they took the car.

Q. I see.

And you said you bought the -- going back to the Ferrari. You said you bought the Ferrari in December

2021, right?
A. Yes, sir.
Q. And when did you say it was stolen?
A. August, about the same time that car was stolen, the same time the Corvette was, and the Durango.
Q. August of which year?
A. I have to look at the police report. Let me see. If you give me a second, I don't want to get the date incorrect. Oh, I don't have that paper on me. Can you give me a second? Let me look to see the --
Q. I actually have a copy of the police report. I can just sort of refresh your --
A. Okay.
Q. So, let's see. The police report says that you're alleging that this vehicle was stolen between December 9th and 12th, 2022. Does that sound right?
A. That's not -- it says August, it should say August, not December.
Q. I'm sorry, September.
A. September.
Q. September 9th to 12th, 2022, is that roughly when you're saying it was stolen?
A. I believe so, yes.
Q. And when did you make this California police report?

A. The same time I made the other ones, and State Farm is -- State Farm has a special investigator, this guy Doug Goldman. They didn't do their work, so he made me go -- let me give you an example. Beverly Hills is here, Los Angeles is here. One police department works with the other.

So, when I called Beverly Hills, they said they didn't take it because it was on Beverly Glen. So, Beverly Glen on this side is Los Angeles. So, there's two different jurisdictions based on the side where the car was dropped off at.

So, then I filed it with Los Angeles. Los Angeles then sent me back to Beverly Hills. Beverly Hills took the other two cars because they were on this side of the street. So, it's real technical, the situation that was going on. That's why one report was filed on time, and the other wasn't filed on time, because they were two different jurisdictions. That's the whole nickel and dime of why this situation is being really tricky on -- there's two police reports.

Q. And would it surprise you if I said the police report reporting the Ferrari stolen looks like it was filed in April of 2024?

A. See, that's where you're incorrect, because Mr. Goldman said he was doing his homework, and he

couldn't get it from LAPD.

So, I finally got a detective on that day to write the report, on April 24th. That's not when it was taken. He wrote in the report on the day that it happened. So, Mr. Goldman tried to trick me up, and had me get a report, because he said their investigator couldn't get it.

Okay. So, I called a detective to be able to get that report on April 24th, after Mr. Goldman said he couldn't get it. So, it wasn't when it was filed. It was filed way back in 2021 with the Corvette and the Durango.

Q. Would it surprise you to learn that someone tried to renew the registration of this Ferrari in your name after the date that you reported it stolen?

A. Yeah, Mr. Bomont (phonetic), the attorney told me that. DMV told me that. And the same thing with the other vehicle, there was a wrecker's name put on it, and the detective, I contacted him and said this was a problem, Mr. Bomont from Boca Raton.

So, there were multiple vehicles that were stolen that they ran the VIN number. Obviously, it wasn't me.

Q. Do you have any idea who might have been trying to renew that registration?

A. I have no idea. I'm nowhere near there. I'm in upstate New York.

MR. FALK: I see.

Ms. Mehdipour, this is the end of my line of questioning about the car, but I did have two or three questions about the real property, which is not --

MS. TESTA-MEHDIPOUR: Sure, go right ahead.

BY MR. FALK:

Q. Mr. Latimore, have you ever heard of a company called Casa de Greatness, LLC?

A. Yeah, that's who I sold the property to.

Q. The property that no longer has a house on it?

A. Correct.

Q. And how much did you sell the property for?

A. I don't have any of that paperwork on me. I don't really know how that worked. I knew that I was in financial trouble with the person that I sold it to. So, whatever was owed to them was sold in a quick claim deed.

Q. And what was the name of the person you interacted with at Casa de Greatness?

A. Jeff Remington.

Q. And how did you come to meet Jeff or Casa de Greatness?

A. They had been doing multiple, like, security

jobs for my properties and vehicles for years.
Q. And when did you make this sale to Casa de Greatness?
A. I believe when I had to leave town. Like I said, I had multiple deaths in my family and I left town.
Q. Roughly when was that?
A. Let me see. I could look at the death certificate maybe. 2023, 2023.
Q. And just to be clear, you do not recall how much you sold this property for?
A. No. I did a quick claim deed, as I said. I owed this person quite a substantial amount of money over the years for their work that I was unable to pay.
Q. All right. So this was basically them forgiving the debt in exchange for getting the quick claim deed?
A. Correct.
Q. And how much debt did you owe them at the time that they forgave it?
A. 450, 600,000, something like that. I'm not 100 percent sure of the exact amount.
MR. FALK: Ms. Mehdipour, that concludes my questioning for now, but I'm going to reserve the right to come back in if I need to.
MS. TESTA-MEHDIPOUR: Sure, sure.

Are you intending to take a 2004?

MR. FALK: I guess I'll have to consult with my client about --

MS. TESTA-MEHDIPOUR: Okay.

MR. FALK: -- the go-forward strategy.

MS. TESTA-MEHDIPOUR: Sure. Would you let me know?

MR. FALK: I will.

MS. TESTA-MEHDIPOUR: Thank you so much, Counsel.

CONTINUED EXAMINATION

BY MS. TESTA-MEHDIPOUR:

Q. Okay. Mr. Latimore, just a couple of other questions.

You have another entry here that says, Synchrony, stolen Polaris, $6,000.

A. Yes, ma'am.

Q. Was that part of the theft that took place in the September 9th, '22 police report, or was that separate?

A. I'm not sure exactly when that was, but there was -- it's on my credit report, that insurance paid it, but they didn't pay what was -- I guess, $1,200 that was left over on the payments.

Q. Okay. Do you have --

A. That's why I listed it, as on the credit report.

Q. Okay. Do you have any documentation to show what insurance paid, for example, copies of the checks, or a statement, or anything along those lines for any of these claims that you made to your insurance company?

A. I don't have any paperwork, just this last bankruptcy stuff.

Q. Okay.

A. I literally don't keep stuff.

Q. Okay, but if you received any insurance proceeds, would you have deposited those checks into a bank account?

A. No, I don't have a bank account.

Q. Okay, and when was the last time you had a bank account in your name?

A. When Ferrari garnished my last wages.

Q. And when was that?

A. I think two years ago.

Q. So, two years ago?

A. Yeah, Mr. Falk may know the exact date. Contreras (phonetic), I tried to stop them from garnishing wages. They got a stay to garnish wages out of Bank of America, Chase --

Q. Okay.

A. -- Wells Fargo. So I closed all those accounts.

Q. Okay. So you at one point had three accounts with Bank of America, Wells Fargo, and Chase?

A. Yes, ma'am.

Q. Okay, and that could have been sometime in '23?

A. Yeah, I believe whenever State Farm -- or whenever Ferrari started garnishing the wages, I closed them down.

Q. Okay. Latimore Enterprises, is that operating?

A. No.

Q. When did it stop operating, and what did it do?

A. Latimore Enterprises built gyms, worked with a lot of police officers, as far as training. Yeah, that's -- high-end physical fitness, high-end knowledge of mixed martial arts, building gyms, building facilities.

Q. When did that entity stop operating?

A. When I had multiple deaths in my family, I had to go take care of family members.

Q. Do you recall what year that was?

A. It had to be 2023.

Q. Okay, and then what about -- so is it

correct to say that Latimore Enterprises has no assets and no bank accounts?

A. Correct.

Q. What is Gifted 30, 3-0, LLC?

A. That was a company that I did start in Florida, just to have a company in Florida, because Latimore Enterprises was in California. So I started Gifted 30, I was transferring it over from Latimore Enterprises to Gifted 30, because Latimore Enterprises was (inaudible) -- so I needed to get an LLC. That's why I was transitioning, but I've since closed Gifted 30 down.

Q. Okay, and when did you stop operating or using that name, Gifted 30, LLC?

A. Right, when Ferrari was trying to take money from me, when State Farm wasn't willing to pay for a car that I'm paying insurance for 30 years on, that I've had insurance for 30 years with State Farm, and they stopped paying --

Q. So what year was that then?

A. -- (inaudible) vehicle?

2023, I believe.

Q. Okay, and Gifted 30, LLC has no assets right now?

A. No.

Q. As of the date of your petition, the same

thing, no assets?
A. Yes, ma'am.
Q. No bank accounts?
A. No.
MS. TESTA-MEHDIPOUR: Okay. All right. I do have other cases, and so what I'm going to do is reach out to you, Mr. Latimore, if we need to take any further depositions.
BY MS. TESTA-MEHDIPOUR:
Q. You did -- one thing, though. You did list cash. Are you holding $2,000 in cash?
A. That's been spent, that was a month ago.
Q. Okay, but as of the day you filed for bankruptcy, which is a snapshot of what you had, did you have the $2,000 in cash?
A. Yes, ma'am.
Q. Okay. Nothing more than that?
A. No.
Q. All right, and then on your Statement of Financial Affairs, specifically Number 18, you list an entry that says, all tools stolen 75,000. Is that right?
A. Yes, ma'am.
Q. And that's part of the same theft or separate?
A. That was a separate theft that was filed

with the LoanCare Insurance, and they paid out to the loan company.

Q. Okay.

A. I didn't get any money.

Q. Was that -- did you say that was with State Farm, I couldn't hear you, or another company?

A. No, that was the -- that's the forced place insurance on the property.

Q. Thank you.

All right. Just a couple more questions.

Other than everything you've testified to today, and what you have in your bankruptcy papers, have you transferred any of your property or assets with a value of more than $2,500 in the last four years?

A. No, ma'am.

Besides the property, you said, correct?

Q. Besides anything in your papers or what you've told us about today.

A. Yeah, yeah, no, ma'am.

Q. Okay. Have you borrowed money from any friends or family, and in the year before your bankruptcy repaid those monies?

A. No, ma'am.

Q. And have you read the bankruptcy information sheet that's posted by the U.S. Trustee's Office?

A. Yes, ma'am.

MS. TESTA-MEHDIPOUR: All right. So, I will conclude the 341, wish you the best of luck, sir, and if we need anything further, I will reach out to you, okay? You may disconnect.

MR. LATIMORE: All right. Thank you.

MS. TESTA-MEHDIPOUR: Thank you. Thank you, Counsel.

(Thereupon, the 341 Meeting of Creditors was concluded.)

## CERTIFICATION

STATE OF FLORIDA :
COUNTY OF MIAMI-DADE :

I, Cheryl L. Jenkins, RPR, RMR, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing Section 341 Meeting of Creditors was transcribed by me from a digital recording made on the date and at the place as stated in the caption hereto on page 1; that the foregoing computer-aided transcription is a true record to the best of my ability of said proceedings.

WITNESS my hand this 10th day of February, 2026.

______________________________

CHERYL L. JENKINS, RPR, RMR

Court Reporter and Notary Public
in and for the State of Florida at Large
Commission #HH 715336
December 27, 2029